# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

CRIMINAL ACTION NO. 09-67-KSF            *ELECTRONICALLY FILED*
(Civil Action No. 13-7315-KSF)

UNITED STATES OF AMERICA            PLAINTIFF

V.      **RESPONSE OF UNITED STATES IN OPPOSITION TO BARNETT'S MOTION TO VACATE SENTENCE**

ROBERT HERALD BARNETT            DEFENDANT

\* \* \* \* \*

Barnett's 28 U.S.C. § 2255 motion to vacate his sentence should be denied because he cannot show that his trial counsel was ineffective during plea negotiations and because his other claims of ineffective counsel fail as a matter of law. Thus, he cannot "show '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir.2003)).

## STATEMENT OF THE CASE

In 2010, after a four-day trial, a jury found Barnett guilty of murder-for-hire (Counts 1 and 2), transferring firearms to commit crimes of violence (Count 3), using firearms during and in relation to crimes of violence (Count 4), possessing a machinegun (Count 5), possessing a firearm with a removed serial number (Count 6),

possessing unregistered silencers (Counts 7 and 8), and tampering with a witness (Count 13). The jury found Barnett not guilty of four counts of solicitation to commit a crime of violence (Counts 9, 10, 11, and 12). [R. 24: Superseding Indictment; R. 42, 43, 44 & 45: Minute Entries; R. 49: Jury Verdict.] Senior Judge Karl S. Forester sentenced Barnett to imprisonment for 480 months. [R. 58: Judgment at 3; R. 85: Court, TR (Sentencing) at 6.] The Court of Appeals affirmed Barnett's conviction and sentence. [R. 90: Order of USCA.] The Court issued its mandate on July 23, 2012. [R. 91: Mandate.] Barnett timely filed his motion to vacate on October 8, 2013. [R. 98: Motion.]

## STATEMENT OF THE FACTS

During February 2009, Barnett told Johnny Pennington, an eastern Kentucky business acquaintance, that "he wanted someone killed," and he asked if Pennington knew of anyone who "could get rid of someone." [R. 79: Johnny Pennington, TR (Trial Vol. 2) at 47-50.] Barnett said that he wanted to hire someone to abduct three people so that he could torture them, extract information from them, kill them, and bury their bodies at a strip mine. One of the people that Barnett mentioned was Bill Polan, a former business associate, who was living in Huntington, West Virginia. Barnett said that Polan "owed him some money." Pennington told Barnett that he would call a friend named "Ed" who lived in Reno, Nevada, to "see if [Ed] was interested in doing the job." [*Id.* at 50-53.] Pennington said that hiring "a hitman" would probably cost $10,000, and Barnett replied that he would need thirty days "to

2

get the money together where nobody would know how he was getting the money, where it could be traced." Barnett also said that he had a machinegun with a silencer that the hitman could use. [*Id.* at 53-54.]

After this conversation, Pennington contacted his attorney, who set up a meeting with a federal prosecutor and with Jesse Hooker, an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives. At the meeting on February 19, 2009, Pennington explained what Barnett had told him, and he agreed to cooperate in an undercover investigation of Barnett's activities. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 24-26; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 54-55.] As part of the investigation, Pennington agreed to introduce Agent Hooker to Barnett as a hitman named "Ray" from Reno, Nevada. Pennington planned to tell Barnett that "Ray" was the son-in-law of his friend "Ed." [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 26, 36-37, 41-42.]

Later, on February 26, when Pennington met again with Barnett, Barnett gave a $5000 check to Pennington and told him to cash it so that Barnett would have some money to pay the hitman. [*Id.* at 30-34; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 59-62; *see* R. 46: Exhibit and Witness List at 1; Government Trial Exhibit 1A.*] On March 3, federal agents placed a hidden audio recording device on Pennington, and Pennington went to Barnett's machine shop in Salyersville, Kentucky, to meet

---

*The government trial exhibits, the court exhibits (transcripts of video and audio recordings played to the jury), and the affidavit of counsel cited in this response are attached.

3

with Barnett. The agents told Pennington to say that he had located a hitman from Reno who would come to Kentucky in a few days. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 34-36, 38; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 62.] At their meeting, Pennington told Barnett that "a man will be here either tomorrow or Thursday," and Barnett replied, "Oh, that's wonderful." [R. 46: Exhibit and Witness List at 4; Court Exhibit 1 (transcript of Government Trial Exhibit 2) at 13; *see* R. 78: Jesse Hooker, TR (Trial Vol. 1) at 39-40; R. 79: Colloquy, TR (Trial Vo1. 2) at 200-01.] Barnett said that he wanted the hitman to remove Bill Polan's eyes, thumbs, and testicles. [R. 46: Exhibit and Witness List at 4; Court Exhibit 1 (transcript of Government Trial Exhibit 2) at 14-15, 18.] Barnett said that he had the rest of the money and that he would provide the hitman with a gun, a silencer, and ammunition. [R. 46: Exhibit and Witness List at 4; Court Exhibit 1 (transcript of Government Trial Exhibit 2) at 16, 21-23.] Immediately after this meeting, Pennington went to a bank to cash the $5000 check that Barnett had given to him. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 38-41; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 62-63.]

On March 5, Agent Hooker directed Pennington to tell Barnett that the "hitman" had arrived and wanted to meet with them in Mt. Sterling, Kentucky. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 41, 43-44; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 63-64.] When Pennington called Barnett that morning to tell Barnett to come to Mt. Sterling, Barnett said that he did not have "access" to any firearms

4

until that evening. Barnett said that he would call Pennington after he tried to "get up with this stuff." [R. 46: Exhibit and Witness List at 4; Court Exhibit 2 (transcript of Government Trial Exhibit 4, Part 1) at 1-2; *see* R. 78: Jesse Hooker, TR (Trial Vol. 1) at 44-45; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 64; R. 79: Colloquy, TR (Trial Vo1. 2) at 200-01.] When Barnett called back, he confirmed that he could not "get a hold of nothing" until that evening. Pennington said that the hitman was "really upset" by the delay. Pennington suggested that Barnett call the hitman, and he gave a telephone number to Barnett. [R. 46: Exhibit and Witness List at 4; Court Exhibit 3 (transcript of Government Trial Exhibit 4, Part 2) at 1-2; *see* R. 78: Jesse Hooker, TR (Trial Vol. 1) at 44-45; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 64-65; R. 79: Colloquy, TR (Trial Vo1. 2) at 200-01.] Barnett called the number, introduced himself as "a friend of Johnny Pennington," and said he did not "have access to this stuff" until the evening. [R. 46: Exhibit and Witness List at 4; Court Exhibit 4 (transcript of Government Trial Exhibit 4, Part 3) at 1; *see* R. 78: Jesse Hooker, TR (Trial Vol. 1) at 44-46; R. 79: Colloquy, TR (Trial Vo1. 2) at 200-01.] Agent Hooker told Barnett that his name was "Ray," and he suggested that Barnett and Pennington meet with him in Mt. Sterling to provide the "down payment" and that they return that evening with "what I need" to "complete the package." [R. 46: Exhibit and Witness List at 4; Court Exhibit 4 (transcript of Government Trial Exhibit 4, Part 3) at 2-3.] Barnett replied, "I'll be there in an hour and a half." [R. 46: Exhibit and Witness List at 4; Court Exhibit 4 (transcript of Government Trial Exhibit

5

4, Part 3) at 3.]   Agent Hooker had received Barnett's call on a cellular telephone with a Reno, Nevada, telephone number.   Therefore, when Barnett called Hooker, the call was transmitted to a tower in Reno and then to a tower in Mt. Sterling.   [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 42-43, 46-47; R. 79:   Raymond Poulard, TR (Trial Vol. 2) at 39-45.]

Agent Hooker placed a hidden video recorder in a motel room in Mt. Sterling to record his meeting with Barnett and Pennington.   [R. 78:   Jesse Hooker, TR (Trial Vol. 1) at 47-48.]   Barnett and Pennington arrived at the motel in the early afternoon of March 5.   [*Id.* at 48-49; R. 79:   Johnny Pennington, TR (Trial Vol. 2) at 66.] Barnett told Hooker that he wanted Bill Polan's eyes, thumbs, and testicles — what Barnett described as "worse than death" — and Hooker replied, "That's probably going to kill him."   [R. 46:   Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 21-23; *see* R. 78:   Jesse Hooker, TR (Trial Vol. 1) at 50-52; R. 79:   Colloquy, TR (Trial Vol. 2) at 200-01.]   Barnett then explained how Hooker could shoot Polan.   [R. 46:   Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 24.]   Barnett said, "[I]f you can, I want the products and leave him alive. . . .   But, if you can't, rather than you getting caught, go ahead and do your job."   [R. 46:   Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 25.]   When Hooker requested "the down payment," Pennington explained that he had cashed Barnett's check, and he gave $5000 to Hooker.   Barnett said that he would provide the final payment.

6

[R. 46: Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 26, 41; R. 78: Jesse Hooker, TR (Trial Vol. 1) at 52-54; *see* R. 46: Exhibit and Witness List at 1; Government Trial Exhibit 3A.] Barnett later told Hooker just to bring back one of Polan's thumbs. [R. 46: Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 29.] Barnett said that he would give Hooker a pistol with a silencer, a "fully automatic nine millimeter" machinegun with a silencer, and ammunition. Barnett explained that the machinegun was "[i]mpossible to trace" because he had removed the serial number. [R. 46: Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 34-35, 45, 47-49, 64-65.] Hooker told Barnett that he would go to Huntington as soon as Barnett gave him the firearms. [R. 46: Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 47, 51.] Barnett said that he would try to return that evening. [R. 46: Exhibit and Witness List at 4; Court Exhibit 5 (transcript of Government Trial Exhibit 5) at 60-61.]

Later, when Pennington called Barnett, Barnett said that he had the firearms. They went back to Mt. Sterling in the evening and met Agent Hooker in the motel's parking lot. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 55; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 67-68.] Agent Hooker placed a hidden video recording device on his body to record this meeting. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 55-56.] Barnett gave Hooker a machinegun, a silencer to attach to the machinegun, a Ruger semiautomatic pistol with an attached silencer, and 409

7

rounds of ammunition. [*Id.* at 57-60; R. 79: Michael Powell, TR (Trial Vol. 2) at 184-85, 190-91, 194-95, 198; *see* R. 46: Exhibit and Witness List at 1-2; Government Trial Exhibits 9B, 10A, 11A & 12A.] After giving the firearms and ammunition to Agent Hooker, Barnett said, "Now, look here. I studied the case. You don't want to remove his finger. What that is, that's proof of a hit man that's taken that for proof. . . . You just leave him laying." [R. 46: Exhibit and Witness List at 4; Court Exhibit 6 (transcript of Government Trial Exhibit 8) at 12; *see* R. 78: Jesse Hooker, TR (Trial Vol. 1) at 56, 97-98; R. 79: Colloquy, TR (Trial Vol. 2) at 200-01.] Barnett also told Hooker that, if Polan's son was there, "Let him go to heaven." [R. 46: Exhibit and Witness List at 4; Court Exhibit 6 (transcript of Government Trial Exhibit 8) at 17.] Barnett directed Hooker to meet him in Salyersville the next morning for the final payment. [R. 46: Exhibit and Witness List at 4; Court Exhibit 6 (transcript of Government Trial Exhibit 8) at 32-38.]

Immediately after this parking lot meeting, Agent Hooker returned to the motel room and disabled the hidden video recording device. He then heard a knock on the door. Barnett and Pennington were there because Barnett wanted to give Hooker "steel knuckles." Barnett told Hooker that the knuckles could "knock Bill Polan out" and "break his jaw." [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 61-62; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 68; *see* R. 46: Exhibit and Witness List at 2; Government Trial Exhibit 14A.]

The next day, March 6, Agent Hooker drove to West Virginia, where he located Bill Polan and told him that Barnett was trying to hire someone to kill him. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 63-64; R. 79: William Polan, TR (Trial Vol. 2) at 28.] Hooker then called Pennington and told him to call Barnett. Hooker directed Pennington to tell Barnett that Hooker had completed the job and wanted to meet in Salyersville to collect the final payment. [R. 78: Jesse Hooker, TR (Trial Vol. 1) at 64; R. 79: Johnny Pennington, TR (Trial Vol. 2) at 69.] During a brief telephone conversation, Pennington told Barnett that the meeting time was at "two o'clock." Pennington then remarked, "Says you'll be very happy." Barnett replied, "Alright" and "Thank you." [R. 46: Exhibit and Witness List at 4; Court Exhibit 7 (transcript of Government Trial Exhibit 15) at 1; *see* R. 79: Johnny Pennington, TR (Trial Vol. 2) at 69-70; R. 79: Colloquy, TR (Trial Vol. 2) at 200-01.] When Barnett drove his truck into a parking lot in Salyersville for the agreed meeting with Hooker, federal agents arrested Barnett and found $3000 in his pocket. [R. 79: Russell King, TR (Trial Vol. 2) at 2-5; *see* R. 46: Exhibit and Witness List at 2; Government Trial Exhibit 16A.]

In April 2009, while in prison and prior to the trial, Barnett saw an inmate named William Jewell. Barnett had met Jewell several years earlier while Jewell was living in Salyersville. [R. 79: William Jewell, TR (Trial Vol. 2) at 146-51.] Barnett asked Jewell to testify falsely at trial that Johnny Pennington had previously tried to sell two machineguns, a Ruger pistol, and silencers to Jewell. In fact, Jewell had

9

never met Pennington. Barnett promised to give an oil and gas lease to Jewell in exchange for the false testimony. [*Id.* at 155, 158-65; R. 46: Exhibit and Witness List at 4; Court Exhibit 8 (transcript of Government Trial Exhibit 28) at 6-8, 10-11, 14; *see* R. 79: Colloquy, TR (Trial Vol. 2) at 200-01.]

At trial, Barnett testified that he never intended to harm anyone or to have anyone killed, although he agreed that "some of the stuff" that he said on the audio and video recordings did not "look good" for him. [R. 80: Robert Barnett, TR (Trial Vol. 3) at 41, 79-80, 82, 85.] He said that he thought that Agent Hooker was a debt collector, not a hitman. He said that Pennington told him what to say to Hooker and that he played along to keep Pennington "happy." He said that he had never owned an illegal gun, but he had previously seen Pennington with a machinegun and a pistol. [*Id.* at 80-83, 117.] According to Barnett, prior to the motel parking lot meeting, Pennington pointed the pistol at him and told him to give the "stuff" to Hooker and to tell Hooker to kill Polan. [*Id.* at 66-67, 83.] He said that he thought he was going to meet someone to buy some pipes the next day when he was arrested. [*Id.* at 114.] At sentencing, Judge Forester found that "Mr. Barnett obstructed justice by attempting to have another person testify falsely in his behalf and by perjuring himself at trial." [R. 85: Court, TR (Sentencing) at 5; *see* R. 62: Presentence Report at ¶¶ 24-25, 27.]

# ARGUMENT

## I. Barnett cannot show that his trial counsel was ineffective during plea negotiations

The Sixth Amendment right to effective assistance of counsel applies during plea negotiations. *Missouri v. Frye*, 132 S. Ct. 1399, 1405-08 (2012). "To establish ineffective assistance of counsel, a petitioner bears the burden of showing: '(1) his trial counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant.'" *McPhearson*, 675 F.3d at 559 (quoting *Mallett*, 334 F.3d at 497 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984))). "Trial counsel's performance is deficient if his 'representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). "This standard is highly deferential, and we apply a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting at *Strickland*, 466 U.S. at 689). To establish prejudice, "a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 694). "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id.*

Barnett fails to prove deficient performance. He alleges that his trial attorney, Brent Caldwell, "guaranteed" that he would "win the case" and advised him "not to accept any plea deals from the government." [R. 98: Motion at 8 (Ground One).] He also claims that, but for this advice, he "would have accepted a reasonable plea

deal." [*Id.* at 9.] According to Caldwell, however, he "talked at length with [Barnett] about the evidence against him and continually advised [Barnett] that the government had an extremely strong case against him which would likely result in his conviction and a long prison sentence." [Affidavit of Brent L. Caldwell at ¶ 5.] Caldwell "did not advise [Barnett] to reject any plea deal nor did [he] ever state to [Barnett] that he would guarantee [Barnett] would be acquitted on all counts at a trial." [*Id.* at ¶ 7.] The government made a plea offer, but not one to Barnett's liking: The government's offer required Barnett "to plead guilty to the machine gun charge which carried a minimum sentence of thirty (30) years." [*Id.* at ¶ 9; *see* R. 24: Superseding Indictment at 2-3 (Count 4); R. 62: Presentence Report at ¶ 86 ("As to Count Four, the minimum term of imprisonment is not less than 30 years, pursuant to 18 U.S.C. § 924(c)(1)(B)(ii).").]  Barnett, "who was 71 years of age at the time, would not accept that deal and considered it a death sentence." [Affidavit of Brent L. Caldwell at ¶ 9.] "The government also made it very clear that a lesser deal would not be offered in light of the additional charges added to the indictment which included a new charge that [Barnett] attempted to solicit someone in jail to kill the undercover agent." [*Id.*]

Barnett is not entitled to an evidentiary hearing. "We have held that where 'the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of facts,' no hearing is necessary." *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (quoting

*Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir.1999)). Moreover, "no hearing is required where 'the record conclusively shows that the petitioner is entitled to no relief.'" *Id.* (quoting *Arredondo*, 178 F.3d at 782). In light of the overwhelming evidence against Barnett, *see supra* Statement of the Facts, Barnett's claim that Caldwell guaranteed victory at trial is inherently incredible. As Caldwell explained, "Nothing could be further from the truth given the overwhelming evidence provided pretrial by the government through the audio and video tapes showing [Barnett's] actions and words in this case." [Affidavit of Brent L. Caldwell at ¶ 7.] Regardless, even accepting Barnett's allegations as true, he cannot show prejudice. Uncontradicted in the record is the government's nonnegotiable plea offer that would have required a seventy-one-year-old man to serve thirty years in federal prison, and Barnett cannot credibly claim that he would have accepted a thirty-year offer.

## II. Barnett's other claims of ineffective counsel fail as a matter of law

Caldwell could not have been ineffective for failing to raise Barnett's remaining claims because those claims are legally unfounded. *See McPhearson*, 675 F.3d at 559 (explaining that defendant bears burden to show that "representation fell below an objective standard of reasonableness").

• *Claim that two witnesses testified about conversations with Barnett after his Sixth Amendment right to counsel attached.* [R. 98: Motion at 13-14 (Ground Two).] "[A] defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel

13

on other charged offenses." *Texas v. Cobb*, 532 U.S. 162, 168 (2001). Agents arrested Barnett on March 6, 2009. [R. 79: Russell King, TR (Trial Vol. 2) at 3.] On March 9, 2009, the United States filed a criminal complaint against Barnett with murder-for-hire and firearms crimes that occurred on March 5, 2009. [R. 1: Complaint.] On March 9, 2009, Barnett also appeared in court and received appointed counsel. [R. 3: Minute Entry.] On March 24, 2009, Brent Caldwell entered his appearance as Barnett's attorney, replacing the appointed counsel. [R. 10: Notice.] On April 3, 2009, the grand jury returned an indictment charging Barnett with murder-for-hire and firearms offenses based on the same allegations in the complaint. [R. 13: Indictment (Counts 1-8).] On August 7, 2009, the grand jury returned a superseding indictment that contained additional charges of solicitation to commit a crime of violence and witness tampering. These crimes took place on March 6 and April 20, 2009. [R. 24: Superseding Indictment (Counts 9-13).] Two inmates, who were in custody with Barnett and who cooperated with federal agents, testified about Barnett's statements that related to the additional charges. [*See* R. 79: Patrick Holder, TR (Trial Vol. 2) at 114-30; R. 79: William Jewel, TR (Trial Vol. 2) at 150-70.] Thus, Barnett's statements that related to the solicitation and witness tampering charges were admissible "notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." *Cobb*, 532 U.S. at 168. Moreover, Barnett could not prove prejudice regarding the solicitation charges because the jury found him not guilty of those counts. [*See* R. 49: Jury Verdict (Counts 9-12).]

• *Claim that the government manufactured federal jurisdiction on Count 1 (using a telephone with the intent that a murder be committed in exchange for money).* [R. 98: Motion at 15 (Ground Three).] "'[M]anufactured jurisdiction' as an independent doctrine is a dubious concept." *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010) (quoting *United States v. Burdette*, 86 F. App'x 121, 127 (6th Cir. 2004)). Courts have refused to recognize a "manufactured jurisdiction defense" when the government "merely afforded the opportunity, and the defendant chose to seize it." *Id.* Here, Barnett initiated the telephone call to the undercover agent, whom he thought was a hitman. [R. 46: Exhibit and Witness List at 4; Court Exhibit 4 (transcript of Government Trial Exhibit 4, Part 3); R. 78: Jesse Hooker, TR (Trial Vol. 1) at 44-46.] Even when the government initiates the call to the defendant, courts have rejected the manufactured jurisdiction defense. *See, e.g., United States v. Burdette*, 86 F. App'x.121, 127-28 (6th Cir. 2004) (citing, e.g., *United States v. Hall*, No. 97-5053, 1998 WL 670025 (6th Cir. Sept. 18, 1998)). Thus, Barnett could not have successfully raised this defense.

• *Second Amendment claim*. [R. 98: Motion at 15 (Ground Four).] This claim fails because the right to keep and bear arms does not extend to "possession of weapons for unlawful purposes." *United States v. Greeno*, 679 F.3d 510, 520 (6th Cir. 2012); *see id.* ("the right to keep and bear arms is for *lawful purposes*" (citing *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008)). Barnett possessed the firearms as part of his murder-for-hire crime. *See supra* Statement of the Facts.

• *Claim that the jury failed to find under Count 4 that Barnett used or carried the machinegun during and in relation to his murder-for-hire crime.* [R. 98: Motion at 15 (Ground Five).] The machinegun provision in 18 U.S.C. § 924(c)(1)(B)(ii) is an element of the § 924(c)(1) offense that must be charged in an indictment and proved to a jury beyond a reasonable doubt. *United States v. O'Brien*, 560 U.S. 218, 235 (2010). Here, the indictment alleged that Barnett, "during and in relation to" his murder-for-hire crime, "used and carried firearms," including "a Cobray, model PM-II, 9mm caliber machinegun." [R. 24: Superseding Indictment at 2-3 (Count 4).] As to Count 4, the jury found "beyond a reasonable doubt" that Barnett "knowingly used or carried during and in relation to" the murder-for-hire crime a "Cobray machinegun." [R. 49: Jury Verdict at 1.] Thus, Barnett's claim is based upon a faulty premise.

• *Claim that Barnett could lawfully possess the machinegun.* [R. 98: Motion at 16 (Ground Six). "In an effort to restrict the availability of machineguns, Congress amended the Gun Control Act in 1986, making it illegal to possess or transfer any machinegun except one lawfully possessed before the amendment's May 19, 1986, effective date . . . ." *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 593 (D.C. Cir. 1996) (citing 18 U.S.C. § 922(o)). Lawful possession of a machinegun is an affirmative defense that requires "proof that the weapon was registered in the National Firearms Register and Transfer Record." *United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996). Count 5 charged Barnett unlawfully possessing a machinegun. [R. 24: Superseding Indictment at 3.] Barnett could not have raised an affirmative defense of lawful

16

possession because the United States proved that he had no machineguns registered in the National Firearms Register and Transfer Record. [*See* R. 79: Denise Brown, TR (Trial Vol. 2) at 106, 108-09; *see also* R. 46: Exhibit and Witness List at 3; Government Trial Exhibit 32.]

- *Claim that counsel was ineffective for failing to raise unnamed issues on appeal.* [R. 98: Motion at 16 (Ground Seven).] By failing to develop any argument, Barnett has waived this claim. *See United States v. Fekete*, 535 F.3d 471, 482 (6th Cir. 2008) (holding that undeveloped arguments are deemed waived); *see also Coleman v. Shoney's, Inc.,* 79 F. App'x 155, 157 (6th Cir. 2003) (holding that, despite liberal construction of their arguments, pro se litigants must still advance issues with some effort of developed argumentation).

- *Entrapment defense claim.* [R. 98: Motion at 16 (Ground Eight).] The "central inquiry" of the entrapment defense "is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so." *Al-Cholan*, 610 F.3d at 950 (quoting *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984)). An entrapment defense fails if "the evidence incontrovertibly establishes that he was predisposed to commit the offense." *Id.* at 951. Again, Barnett waives the claim by failing to develop an argument. Regardless, an entrapment defense could not have succeeded in light of

17

the overwhelming evidence that Barnett was predisposed to commit his crimes. *See supra* Statement of the Facts.

- *Claim that a violation of state law is an essential element of the murder-for-hire offense.* [R. 98: Motion at 16 (Ground Nine).] Again, Barnett bases an argument upon a faulty premise. To find Barnett guilty of murder-for-hire, the instructions required that the jury find that Barnett acted "with the intent that a murder be committed in violation of the laws of the State of West Virginia," which "means intentionally and maliciously killing another person." [R. 47: Jury Instructions at 14.] Thus, by finding Barnett guilty of murder-for-hire, the jury found that Barnett acted with intent that a murder be committed in violation of West Virginia law. [*See* R. 49: Jury Verdict 1 (Counts 1 and 2).] If Barnett is contending that the government was required to present proof of West Virginia law, his argument fails because the Court of Appeals rejected the same claim on direct appeal. [*See* R. 90: Order of USCA (holding that a state law is not "a fact which must be proven" but instead is "a legal element that the district court explains in the jury instructions").]

- *Claim regarding the government used illegal wiretaps.* [R. 98: Motion at 16 (Ground Ten).] This claim is baseless because the investigation of Barnett's crimes did not involve any wiretaps. *Cf. United States v. Freeman*, 730 F.3d 590, 592 (6th Cir. 2013) (explaining that investigation utilized "wire intercepts of cellular telephones of several individuals pursuant to Title III of the Wiretap Act, 18 U.S.C. §§ 2510-22").

## CONCLUSION

Barnett's motion should be denied.

Respectfully submitted,

KERRY B. HARVEY
UNITED STATES ATTORNEY

By: s/ John Patrick Grant
     Assistant United States Attorney
     260 W. Vine Street, Suite 300
     Lexington, Kentucky 40507
     (859) 685-4904
     FAX (859) 233-2658
     John.Patrick.Grant@usdoj.gov

## CERTIFICATE OF SERVICE

On January 23, 2014, I electronically filed this response and the attachments through the ECF System, and I mailed this response and the attachments to:

Robert Herald Barnett
Reg. No. 12989-032
U.S. Penitentiary – Hazelton
P.O. Box 2000
Bruceton Mills, WV 26525
*Pro Se Defendant*

                                        s/ John Patrick Grant
                                        Assistant United States Attorney